Meredith v. New Jersey Zinc and Iron Co.

WILLIAM T. MEREDITH et al.

v.

THE NEW JERSEY ZINC AND IRON COMPANY.

[Submitted July 21st, 1899.    Decided August 17th, 1899.    Filed March 24th, 1900.]

1. The simple statement, in affirmative language, of the matters required by section 11 of the (New Jersey) act concerning corporations (April 7th, 1875), to be contained in the certificate of incorporation of a company, does not amount to such a limitation upon the future action of its stockholders as will prevent a change in the purposes of the corporation by the consent of two-thirds in interest of its stockholders under section 33 of the same act.

2. The certificate of a corporation organized in 1880 under the (New Jersey) act of April 7th, 1875, stated that the business of selling its manufactured product out of the State of New Jersey was to be carried on in the city of New York. Its property consisted of mines and mining rights in Sussex county, New Jersey, and a plant for reducing the ores therefrom in Essex county, New Jersey. In 1897 it became necessary for it to purchase mines adjoining and mining rights conflicting with its own, and with them to purchase a reducing plant out of the state, of the same character as that owned by it in the state. This additional plant was found to be necessary in order to reduce the increased product due to the said purchase, and its use was highly profitable. —Held, (1) that the use of such plant out of the state was not, under the circumstances, a breach of the contract between the stockholders found in the original certificate. But, if it was, (2) that it could be sanctioned by the assent of two-thirds in value of the stockholders under section 33 of that act.

3. The case of Stickle v. Liberty Cycle Co., 32 Atl. Rep. 708, distinguished.

17

On bill for injunction and relief.

This cause came first before the court on February 8th, 1897, on a motion for an injunction to prevent the carrying out of a contract dated January 6th, 1897, entered into between the several defendants, corporations and individuals, which injunction was refused February 12th, 1897, for reasons stated in *Meredith* v. *Zinc Co., 10 Dick. Ch. Rep. 211.* The complainants immediately appealed from the order refusing the injunction, and pending the appeal the defendants joined in an answer to the bill. The appeal was argued at the November Term, 1897, and the order refusing the injunction was affirmed in March, 1898, upon the opinion of the court below. *11 Dick. Ch. Rep. 454.* The complainants then applied to the court for leave to file a supplemental bill for the purpose of bringing before the court the conduct of the defendants since the filing of the original bill. Leave was so granted, and a joint answer to the supplemental bill was filed in time.

Later on a motion to compel the defendants to answer more fully was made and denied in September, 1898, as reported in *41 Atl. Rep. 229.*

The complainants then, by stipulation, withdrew their replication and agreed to go to hearing upon the bill and answer upon condition that a certain clause in the answer be eliminated.

When the argument was about to commence complainants asked to be relieved from the effect of their stipulation and for leave to offer certain proofs, which was granted. The limit of the evidence to be introduced was in these words : " To show the operation of the mining and manufacturing plants referred to in the supplemental bill and answer that are located without the State of New Jersey."

For a statement of the facts leading up to the making of the agreement whose execution was sought to be enjoined, reference is made to the opinion in *Meredith* v. *Zinc Co., 10 Dick. Ch. Rep. 214, 217.*

Some unimportant errors are found in that statement, which are corrected by the answer as follows:

Meredith *v.* New Jersey Zinc and Iron Co.

"Further answering the said bill of complaint, these defendants jointly and severally aver that for upwards of forty years past litigation in various forms has been pending over the ownership of a large tract of very valuable mineral property in Sussex county, New Jersey, known as the Mine hill tract, which, on the one hand, has been claimed by the New Jersey Zinc and Iron Company and its predecessors in title, and on the other hand by the Lehigh Zinc and Iron Company and its predecessors in title; that in the month of November, 1896, a decision was rendered by the court of errors and appeals of the State of New Jersey in a suit in which the New Jersey Zinc and Iron Company was plaintiff in error and that the Lehigh Zinc and Iron Company was defendant in error, which affirmed a judgment rendered in an ejectment suit in favor of the Lehigh Zinc and Iron Company against the New Jersey Zinc and Iron Company, involving the title to a large and valuable part of the said Mine hill tract, and which, it was claimed by the said Lehigh Zinc and Iron Company, involved the title to a large portion of the remainder of the tract and settled it in favor of the said last-named company. Immediately upon such decision being rendered, both parties to said litigation prepared for a further contest in the courts over the title to the remainder of the said Mine hill tract. Before proceedings were actually begun, however, suggestions were made which led to a negotiation looking towards an adjustment of the controversy, and thereupon ensued many conferences between the representatives of the various parties, in which the representatives of the Mineral Point Zinc Company and the Passaic Zinc Company respectively intervened to assist in bringing the parties together and in reaching an adjustment of the controversy which would be acceptable to both parties.

"After many weeks of constant negotiation the basis of adjustment was finally reached which is embodied in the agreement hereinbefore referred to, dated January 6th, 1897, a copy of which is annexed to the bill of complaint. * * *

"These defendants further aver that all of the stock in the Lehigh Zinc and Iron Company, the Sterling Iron and Zinc Company, the Hardyston Mining Company, the Wetherill Franklinite Company and the Wetherill Concentrating Company, with possibly an exception of the one-fourth interest in the Wetherill Concentrating Company, was owned by Richard Heckscher, August Heckscher, J. Price Wetherill and S. P. Wetherill, who were also the owners of a majority of the capital stock of a Pennsylvania corporation known as the Florence Zinc Company, and that it was found impossible to reach an agreement for the adjustment of the conflicting interests in the Mine hill tract without agreeing to purchase all of the properties or the capital stock of the aforesaid companies. * * *

"The Passaic Zinc Company was also the owner of mineral properties immediately adjoining those of the New Jersey Zinc and Iron Company, in Sussex county, New Jersey, constituting a part of the same vein which is owned and has been worked by the New Jersey Zinc and Iron Company. It also owned works in Jersey City and a spiegel furnace on the Hackensack meadows, which were considered to be of great value to the said New Jersey

Meredith v. New Jersey Zinc and Iron Co.

Zinc Company, and necessary in the proper developments of its enlarged business resulting from the settlement of the controversy over the Mine hill tract· and the acquisition of the undisputed title to the minerals therein. *  *  *

"The said Mineral Point and New Mexico properties were included in the· purchases, because D. B. Jones, the president and principal stockholder of the· said Mineral Point Company, was largely instrumental in making possible a settlement between the representatives of the conflicting interests in the Mine hill tract and took a leading part in the negotiations which resulted in the agreement aforesaid, and he made it a term of the said agreement and a consideration for his effort to bring the same about, that the Mineral Point stock or properties should be included in the purchase by the said New Jersey· Company. *  *  *

"These defendants further answering say that the negotiations resulting in· said agreement were entered into and carried on by the parties thereto with a view to compromising and settling the dispute as to the title to the said Mine· hill tract and the litigation growing out of the same, and that the said agreement itself was entered into and carried out solely with that object."

The facts disclosed by the pleadings and the evidence taken· under leave are as follows :

The day after the refusal of the injunction, namely, February 13th, 1897, the agreement was fully performed by the conveyance to the defendant, the New Jersey Zinc and Iron Company (whose name had been changed to the New Jersey Zinc Company) of all the mineral properties of the defendants the Hardyston Mining Company, the Sterling Iron and Zinc Company and the Passaic Zinc Company, in the Wallkill valley, in Sussex county, and by the execution of the usual authority to transfer all the capital stock of the Lehigh Zinc and Iron Company, which owns a completely equipped reducing plant at Bethlehem,. Pennsylvania, and of the Mineral Point Zinc Company, which owns a plant for reducing zinc ore, situate in Wisconsin ; of the· Florence Zinc Company, which then owned a plant for making· high-grade oxide of zinc from the metal, situate on the Lehigh near Bethlehem, Pennsylvania; of the Wetherill Franklinite· Company and of the Wetherill Concentrating Company, and the· delivery of the certificates of stock to the New Jersey Zinc Company. The Wetherill Franklinite Company, the Hardyston Mining Company and the Wetherill Concentrating Company are·· New Jersey corporations. The Florence Zinc Company is a· Pennsylvania corporation. The Hardyston Mining Company,.

the Wetherill Franklinite Company and the Florence Zinc Company were wound up, and the plant and property of the latter company conveyed to the Lehigh company. This left in existence and under the control of the New Jersey company the Lehigh company and the Mineral Point company. All the properties of the other companies in New Jersey became vested in the New Jersey company, and its holdings of franklinite mines were greatly increased. It acquired the title to no property situate out of the state except through the ownership of shares of capital stock in other corporations. It also became the owner of the licenses under the various patent rights, and the patent rights themselves, mentioned in the agreement and in use by the Lehigh Zinc and Iron Company and its dependencies.

The New Jersey Zinc Company, by the use of the certificates of stock so put in its possession, appointed the directors and officers of the Mineral Point Zinc Company and the Lehigh Zinc and Iron Company, and through them became the practical managers of both of those companies.

All these extra-territorial works have since the change of title been carried on in the manner indicated with great success.

The original smelting works of the New Jersey Zinc and Iron Company were situate at Newark, and they proved entirely insufficient in capacity to work up all the ores which are mined at Mine hill and its near neighbor, Sterling hill, in which latter are found the mines of the original Passaic Zinc Company. It was further found in practice that the reducing and smelting plant of the Lehigh Zinc and Iron Company, at Bethlehem, Pennsylvania, was so situate with regard to fuel, labor and access to market as to be able to reduce the ores and to prepare them for market at a much better advantage than either the Newark works or the works of the Passaic Zinc Company, which are situate upon the Hackensack river, in Hudson county.

With the ownership of the Florence zinc works came a valuable secret process for manufacturing a certain high grade of oxide of zinc, known to no other establishment in the United States. It is a foreign process, and before it was put in use in the United States the zinc workers in this country were unable

to compete for this high grade of oxide of zinc with the foreign producers. The result of the control of the Florence zinc works with its secret process is to give the New Jersey Zinc Company control of the market in this country of that grade of oxide.

The Mineral Point company owns but does not work ore mines, and purchases the ordinary zinc ores, other than franklinite, and works them up into metallic zinc, known as spelter.

The operations of the New Jersey Zinc Company now seem to include three processes: (1) the manufacture of oxide of zinc from franklinite ore taken by it from its own mines; (2) the manufacture of metallic zinc or spelter from franklinite, and, through the Mineral Point works, from ordinary zinc ore; and (3) the manufacture of high-grade oxide from spelter.

The New Jersey Zinc and Iron Company, now the New Jersey Zinc Company, was organized in 1880 to take on the property and good will of the old New Jersey Zinc Company, a specially chartered corporation which owned certain mineral rights in the south half of Mine hill, in Sussex county, and a plant for the reduction of franklinite and zinc ores in Newark, New Jersey. The immediate occasion of its organization was the compromise of a suit in the federal court brought against it by an adverse claimant, who, with the old company, conveyed all rights to the new company; the situation as to the conflicting titles to the veins in the south half of Mine hill being precisely similar to that as to the north half existing just before the date of the agreement here in question.

The certificate of its organization declares as follows:

"*First.* The name assumed to designate such company and to be used in its business and dealings is the New Jersey Zinc and Iron Company.

"*Second.* The places where business of the company is to be conducted are the county of Sussex, in the State of New Jersey; the city of Newark, in the county of Essex and in said state, and the city of New York, in the county and State of New York. And the objects for which said company is formed are:

"The mining of zinc and iron ores and other ores and mineral substances, and the manufacture and sale of the products of such ores and minerals, and the purchasing, leasing and holding and selling such real estate, machinery, mines and mineral rights and merchandise, and other personal property as

Meredith v. New Jersey Zinc and Iron Co.

may be deemed necessary or convenient for the prosecution of the above-mentioned business.

" The business of selling the manufactured products of such ores and minerals out of the State of New Jersey is to be carried on in the said city of New York, and the principal part of the business of said company within this state is to be transacted in the city of Newark aforesaid.

"*Third.* The total amount of said capital stock of said company is three millions and forty thousand dollars.

' " The number of shares into which said stock is divided is thirty thousand and four hundred shares, and the par value of each share is one hundred dollars. The amount with which they will commence business is seven thousand dollars."

On the 1st of February, 1897, and before carrying out the contract of January 6th, 1897, the New Jersey Zinc and Iron Company filed with the secretary of state a certificate and written consent, signed by at least five-sixths in value of its stockholders, assenting to certain changes in its certificate of organization, as follows :

Adding to the second article of the original certificate, after the enumeration of the places where the business of the company is to be conducted, these words :

" The city of South Bethlehem, in the State of Pennsylvania; the city of Mineral Point, in the State of Wisconsin, and such other places in the United States as the business of the company may render expedient."

Changing the second article as follows :

" In article second strike out the clause which reads: ' The mining of zinc and iron ores and other ores and mineral substances, and the manufacture and sale of the products of such ores and minerals, and the purchasing, leasing and holding and selling such real estate, machinery, mines and mineral rights and merchandise and other personal property as may be deemed necessary or convenient for the transaction of the above-mentioned business,' and insert, instead of the said clause, the following, namely: ' The searching for and mining zinc and other ores, minerals and mineral substances; the manufacture of metals and other products; the buying and selling of or dealing in ores, minerals, metals, mineral substances and products; the leasing, purchasing, holding and selling of real and personal estate or of any interest therein ; the purchasing and holding or disposing of the capital stock and obligations of companies or corporations organized for like or similar purposes ; the acquiring and owning or disposing of patents, patent rights and licenses, or any interest therein, and the carrying on of any lawful business relating to the objects above set forth.' "

Increasing the capital stock and adding two new paragraphs as follows:

"*Sixth.* The said company may conduct business in other states or in foreign countries, and may hold, purchase, mortgage and convey real and personal property out of this state.

"*Seventh.* The directors of the company shall have power to make and alter by-laws for its government."

This increase and change was made under the twenty-fourth and thirty-third sections of the act of 1875. *Rev. of 1877 p. 182.*

Section 33 is as follows:

" Every such company, except where otherwise provided in the certificate of incorporation, may, by a vote of two-thirds in interest of the stockholders, or their legal representatives, and in all cases by unanimous consent of the stockholders, at any meeting called for that purpose, reduce its capital stock or change the nature of its business," &c.

It was conceded by the complainants that this certificate and written consent and proceedings therein stated were in all respects regular and entirely sufficient to work the proposed change, if it was competent for such change to be made by anything less than the unanimous consent of all the stockholders. The legality of the increase of capital stock was conceded.

The proofs show that the company's business under the new management is prosperous.

The addition of $3,366,600 to the capital stock provided for was actually issued and delivered to the owners of the stock of the defendants the Lehigh Zinc and Iron Company, the Sterling Iron and Zinc Company, the Hardyston Mining Company, the Mineral Point Zinc Company and the other companies mentioned, and the individual owners of the patents and licenses thereunder.

In addition to that issue upwards of three millions of increase of stock have since been authorized and issued and divided *pro rata* among the several stockholders, including the complainants, who have declined to accept their quota of new stock; so that the total issue is now ten millions.

The mortgage of $1,750,000 provided for in the agreement has also been executed, and $1,261,000 of the bonds sold at par and the proceeds disposed of as therein provided for; and, notwithstanding this great increase of the indebtedness of the company and in its capital stock, the answer alleges, and hence it is an established fact, that the stock has actually increased in market value per share above and beyond any price at which it had ever been sold before the making and carrying out of the contract in question.

It is deemed not worth while to set out at length the provisions of the contract.

*Mr. Joseph Coult* and *Mr. James E. Howell,* for the complainants.

*Mr. Cadwalader* and *Mr. Wickersham* (of New York) and *Mr. Richard V. Lindabury,* for the defendants.

PITNEY, V. C.

It seems to me that several of the questions which arise upon the case as made by the pleadings and proof have been disposed of by the action of the court of errors and appeals in affirming the order refusing the preliminary injunction. *11 Dick. Ch. Rep. 454.* The situation of the cause when it came before that court was precisely like that in the case of *Black* v. *Delaware and Raritan Canal Co., 9 C. E. Gr. 455,* where the court declared its duty to review and pass upon the propriety of the action of this court in refusing a preliminary injunction without regard to what had in the meantime occurred. In doing this the court might, in the present case, have assigned its own reason for its action, or it might simply have affirmed without giving any reason. Instead of doing either it declared that it affirmed "for the reasons given in the court of chancery." Turning to the reasons (thus approved) given in this court, it will be found that the purchase by the New Jersey Zinc and Iron Company of the various properties in question, those situate out of the state as well as those situate within it, was approved as a measure

necessary to be adopted in order to save its property from great depreciation in value by reason of the then recent decision of the court of errors and appeals in the suit between the Lehigh Zinc and Iron Company and the New Jersey Zinc and Iron Company. *30 Vr. 189.*

There was, and, indeed, can be no question made as to the power of the company to buy all the mineral rights that can be found in the valley of the Wallkill, in Sussex county, and its power, under the peculiar circumstances, in order to buy those to include with them properties outside of the state was there affirmed, and the only question left was as to its right to continue to own and operate the works outside of the state so acquired. See *10 Dick. Ch. Rep. 219.*

The case now presented does not materially vary from that which appeared on the motion for injunction, except that the contract has been specifically performed and the extra-territorial works have been kept in operation long enough to prove them to be highly useful and profitable to the company.

The contention of the complainants is that the original certificate of organization of 1880, forming as it did articles of association between the stockholders, constituted a contract as well between the corporation and the state as between the stockholders *inter sese*, which, without the consent of all the stockholders, so far as it is a contract between the stockholders, cannot be changed except by virtue of some enabling act of the legislature in existence and force at the time the contract was entered into, and that the terms of the certificate, properly construed, prohibit the doing of any business within the state except at its mines in Sussex county and at Newark, and from doing any business outside of the state except to sell its wares in the city of New York; and they contend that the doing business through the machinery of a corporation in the towns of Florence and South Bethlehem, in Pennsylvania, and in the State of Wisconsin, is a breach of that agreement which ought, at the instance of the complainants, to be prohibited by this court, and that the purchase of those plants out of this state was *ultra vires* the corporation, and that the whole transaction should be declared void, and the parties re-

Meredith *v.* New Jersey Zinc and Iron Co.

stored to their original position.  The prayer of the supplemental bill in that respect, is as follows:

"That the said contract or agreement set out in the original bill may be declared to have been and to be null and void, and that every act and transaction done thereunder and in pursuance thereof may likewise be set aside and declared null and void, and that the New Jersey Z. & I. Co. may be restored in all things to the position and condition in which it was before the said agreement was executed,"

with the usual prayer for other relief.

The only part of this contention which, under the opinion of the court of errors and appeals, is now open to question is that of the continued operation of the extra-territorial works.

The defendants justify the continued operation of those works by the proceedings which have been taken under the thirty-third section of the act of 1875 and by the fifty-fifth section of the same act, which latter, by its terms, authorizes the purchase of property by the issuing of stock.

It is conceded by the complainants that the original articles of association were made subject to the sections just named, or, as it is sometimes expressed, that those sections are to be "read into" the certificate of organization.

The defendants further claim that what they are doing at Bethlehem, Pennsylvania, is not a breach of the terms of the original certificate of organization constituting the articles of association.

The complainants contend that the proceedings in question, founded upon a consent of two-thirds of the stockholders, are not authorized by the thirty-third section, and their argument in that behalf is as follows: The eleventh section of the act of 1875 states that the certificate of organization shall contain:

"I. The name of the company.

"II. The places in this state or elsewhere where the business of such company is to be conducted and the objects for which the company shall be formed.

"III. The amount of the capital stock.

"IV. The names and residences of the stockholders.

"V. The periods at which the company shall commence and terminate."

Meredith v. New Jersey Zinc and Iron Co.

And further, that " the certificate may contain any limitation upon the powers of the corporation, the directors and the stockholders that the parties signing the same desire."

The contention of complainant is that the statement in the certificate of " the place or places in this state or elsewhere where the business of such company is to be conducted and the objects for which the company shall be formed " constitutes such a limitation.

The thirty-third section provides :

" Every such corporation *except where otherwise provided in the certificate of incorporation* may, by a two-thirds vote in interest of the stockholders, * * .* and in all cases by unanimous consent of the stockholders at any meeting called for that purpose, reduce its capital stock or *change the nature of its business.*"

And the argument of complainant is that the exception just quoted prevents the change of place in this case unless by the unanimous consent of all the stockholders.

The argument advanced by the defendants against that position is that the language " except where otherwise provided in the certificate of incorporation " refers to a special limitation to be inserted at the pleasure of the association in the certificate of organization, under the fifth clause'of the eleventh section, which provides that " the certificate may contain any limitation upon the powers of the corporation, the directors and the stockholders that the parties signing the same desire," and that the designation of the place where the business of the company is to be carried on does not amount to such a limitation, but is simply a compliance with the requirement of the act that such a place shall be designated.

It is plain that the original act, passed March 2d, 1849 (*P. L. of 1849 p. 300 ; Nix. Dig. (4th ed.) 534*) did not contemplate the formation of a corporation in this state to do business out of the state, for the second paragraph of the first section (which corresponds with the eleventh section of the act of 1875) states simply that the certificate shall state the place or places where the business of such company is to be conducted, and the objects for which the company shall be formed, while the later act of

Meredith *v.* New Jersey Zinc and Iron Co.

1875 states "the place or places in this state or elsewhere" where the business of the company is to be conducted.

Then the act of 1849 does not provide that the certificate may contain any limitation upon the powers of the corporation, &c. It does provide for an increase of the capital stock precisely as does the act of 1875, and the twenty-second section of the older act is substantially the same as the thirty-third section of the act of 1875, except that it does not contain the words "except where otherwise provided in the certificate of incorporation," and the other words "and in all cases by unanimous consent of the stockholders."

The privilege given to the promoters of the corporation to limit its powers, &c., by inserting a clause for that purpose in the original certificate, and the exception against altering such certificate by a majority of two-thirds, found in the thirty-third section of the act of 1875, are first found in that act.

I am of the opinion that the contention of the counsel for the defendants in this behalf is correct, and that the designation of the place where the business should be carried on, provided for in the second subdivision of the eleventh section of the act of 1875, does not, when expressed in the ordinary way, in obedience to the command of that section, amount to a limitation upon the powers of the corporation, such as is provided for in the fifth subdivision of the eleventh section and such as forms an exception to the power to change by the consent of two-thirds given by the thirty-third section. I think that the words "except where otherwise provided in the certificate of incorporation" refer to and can only be satisfied by some express provision in effect forbidding a change in the nature of the business except by unanimous consent, and such limitation is not to be implied from a mere compliance with the mandate of the statute to state certain matters in the certificate. To hold the contrary, namely, that the ordinary clauses inserted in obedience to the mandate of the statute and forming the contract between the parties, can amount to a limitation, such as is provided for in the fifth clause of the eleventh section and operate to prevent the action of two-thirds under the thirty-third section, is to prevent any alteration

in that instrument except by the unanimous consent of all the stockholders, and so reduce that section to a mere nullity and render it inoperative in every case.

But the complainants answer to this position that the thirty-third section does not provide for any change in the place where the business shall be carried on, but only for a change in the nature of the business, and that there was here by the certificate of February 1st, 1897, no provision for any "change in the nature of the business" such as is contemplated by section 33 of the act of 1875. Counsel who opened the argument for the complainants contended that the business which the corporation carries on out of this state is precisely the same business which it carried on previous to February, 1897, in this state.

This is true, as shown by the answer and evidence, of the business of smelting zinc ores carried on at South Bethlehem, Pennsylvania, in the plant of the Lehigh Zinc and Iron Company, but it is doubtful if it is strictly true of the business carried on by the Mineral Point Zinc Company or by the plant of the old—now extinct—Florence Zinc Company. At the Mineral Point works they manufacture spelter out of ordinary ores, which they do not mine, and at Florence they manufacture high-grade oxide of zinc from spelter, which they do not even manufacture. And, turning to the original certificate of 1880, I find that the objects of the company are stated to be: "The mining of zinc and iron ores, and other ores and mineral substances, and the manufacture and sale of the products of *such* ores and minerals." If the force of the word "such" is to confine the company's operations to reducing the ores mined by it, then the work done at Florence and also that at Mineral Point is, upon a strict construction, not within the statement in question.

These manufacturing processes were never carried on, as I understand the pleadings and evidence, by the New Jersey Zinc and Iron Company; so that there is nothing in the circumstances of the case to relieve the statement in the certificate from the rather strict construction which I have just suggested. If I am right in this view, then there can be no doubt that the works carried on out of the state at the places just named are in effect

a change in the nature of the business, and so, manifestly, within the scope of the thirty-third section, and hence authorized by the new certificate. This would leave the only matter to be considered the reducing works at Bethlehem.

Be that as it may, to this position of complainant, however well taken, the defendants answer: If there has been no change in the "nature of the business," there has been no breach of the stockholders' contract, for the place of the business so to be carried on was not—so they contend—a material or essential part of that contract.

In answer to this complainants rely upon what was said by Vice-Chancellor Emery in the case of *Stickle (and Perkins)* v. *Liberty Cycle Co., 32 Atl. Rep. 708.* In that case the defendant corporation had been formed after the passage of the act of March 9th, 1889 (*P. L. of 1889 p. 412*), which is an amendment of, but does not materially alter, the fifteenth section of the act of 1875. The certificate stated:

"That the place in this state where the business of such company is to be conducted is the borough of Rockaway, in the county of Morris. * * * The objects for which the company is formed are the manufacture of bicycles, &c. The portion of the business of the said company which is to be carried on out of this state, in the cities of New York and Brooklyn, and elsewhere, is the selling of the manufactured products of said company."

Speaking of that certificate the learned vice-chancellor says: "This certificate, therefore, as to the part of the business to be done out of the state, seems to be a material part of the certificate of incorporation, to the observance of which the incorporators have a right, *under this law of 1889,* to hold the company and its directors, in the absence of an express provision in the contract of incorporation itself that the company may carry on, outside of the state, other portions of the business than that specified." Then, after stating that the act of 1892, passed subsequent to the incorporation of the defendant, authorized generally the company to do business out of the state, he says: "The real question is, I take it, whether, since the law of 1892, a manufacturing corporation which, in its certificate, states that its manufacturing plant and business shall be located in this

Meredith v. New Jersey Zinc and Iron Co.

state, and that the outside business is the sale of the manufactured articles, can, under cover of this law, *change materially and fundamentally the objects* of the company and rights of the company and its shareholders, as stated in the certificate, by removing the manufacturing plant and business beyond the limits of the state and the protection of its laws. My present view is that it cannot, and that the removal of the plant and manufacturing business beyond the state *is a change in a material object of the company*, as stated in the certificate, and should be restrained until the right is determined on final hearing."

In that case there had been no action taken (as has been here) by the directors with the assent of two-thirds of the stockholders to change the nature of the business. So that the question was not whether two-thirds of the stockholders might not provide for moving the works out of the state, but whether the directors could do that without such provision.

But the conclusion of the learned vice-chancellor, as above stated, seems to me to weaken rather than to strengthen the complainants' position, for it holds that a mere change of the place in which the business is carried on was in that case a material and fundamental change in the objects of the company, which is tantamount to holding that it is a matter which may be dealt with under the thirty-third section of the act of 1875. And in fact the counsel who closed the argument for the complainants was constrained to adopt the latter position and contend that the reducing of ores at Bethlehem was a change in the objects and purposes of the corporation.

But the case of *Stickle* v. *Liberty Cycle Co.* differs from this in another respect. Its certificate of incorporation stated: "The portion of the business of the said company which is to be carried on out of this state * * * is the selling of the manufactured product of said company," thus stating with precision what portion of the business was to be carried on out of the state, and by implication declaring that no other part of its business was to be so carried on. Now, turning to the original certificate of the New Jersey Zinc Company, we find the language varying from this, thus: "The business of selling the

manufactured products of such ores and minerals out of the State of New Jersey is to be carried on, &c., in the city of New York." And this language, unlike that in the *Cycle Co. Case,* does not, by implication, declare that no other business besides selling was to be carried on out of the state. This difference seems to me quite material.

Then, again, we find that case differs from the present in still another respect. The bill and affidavits upon which the motion for an injunction rested showed that the complainants were residents of Rockaway and the owners of real estate there, and interested in advancing the general prosperity of the town, and one of them was the owner of the factory used by the corporation, so that there was room for inference that they were induced to assist in the formation of the company and invest their money in it for the purpose of establishing a manufacturing plant in that town, thereby deriving incidental benefit from it, and that if the plant was moved away from Rockaway, as was threatened, they would lose the benefit of its existence there. The proposition there was to move the whole plant out of the State of New Jersey to the State of Connecticut and beyond the jurisdiction of the courts of this state. The learned vice-chancellor might well hold in that case that such a motion was a material and fundamental change in the objects of the company and the rights of the company and its stockholders.

I think these considerations distinguish that case from the present, where all the business which was contemplated by the original association is still carried on in the State of New Jersey. The purchase of the additional mines and mining rights in the county of Sussex is admitted to be clearly within the object and purpose of the original corporation, and the working of its mines and reducing the minerals derived therefrom to merchantable commodities is the principal object of the company. Now, it could not have been of the least consequence to the original stockholders where that working up into marketable material took place—whether in Newark, or Camden, or Phillipsburg, or Philadelphia, or New York. They had no local interests in

Meredith v. New Jersey Zinc and Iron Co.

any particular place. The question for them was, where could it be done the cheapest?

At the time of its organization this company succeeded to the rights of the old original New Jersey Zinc Company, which already owned a manufacturing plant at Newark as well as rights in the mines in the Wallkill valley, and they had their selling place in the city of New York, which accounts for the fixing those localities in the certificate of organization. But there is nothing found in the history of the corporation and its operations, or in the circumstances surrounding them, to indicate that there was any particular charm in the working up of the mineral products in the city of Newark rather than in the city of Bethlehem, Pennsylvania, or that such a change of the location of the reducing plant "changes materially and fundamentally the objects of the company and the rights of the company and its shareholders" to such an extent as to induce a court of equity to interfere to prevent a material injury to the complainants.

The case in hand is in marked contrast with *Kean* v. *Johnson, 1 Stock. 401; Zabriskie* v. *Hackensack and New York Railroad, 3 C. E. Gr. 178; Black* v. *Delaware and Raritan Canal Co., 9 C. E. Gr. 455,* and *Mills* v. *Central Railroad, 14 Stew. Eq. 1,* in which cases the doctrine of the inviolability of contracts between stockholders, without the consent of each stockholder, has been stated, exemplified and upheld by our courts. In each of them there was a radical change in the purpose and objects of the corporation. In *Kean* v. *Johnson,* the complainant was a stockholder in a company chartered and organized for the purpose of building and operating a railroad from Elizabeth to Somerville, and the proposition was in effect to merge that into a company for the purpose of extending its line from Somerville to Easton. The transaction was, in form, a sale of the older railroad to the later one. Its real character was well stated by the learned master (at *p. 418*) as follows: "In form, it was a sale of the road; in fact, it was an extension of it—an addition to the originally proposed scheme." The railroad from Elizabeth to Somerville was of easy construction, passed through a thickly populated district, and its operation proved to be highly

Meredith v. New Jersey Zinc and Iron Co.

profitable. The extension from Somerville to Easton passed through a different character and section of country, involving greater expense in its construction, and was not so promising an investment. Whether the extension would be a pecuniary success or not was problematic and speculative.

The same was true in a more marked degree of the proposed extension of the railroad in *Zabriskie* v. *Hackensack Railroad Co.*, 3 *C. E. Gr. 178*. Both these changes in the contractual rights of the stockholders were held by the learned judges to be a " fundamental alteration of the contract" and a ".material deviation" from the original object, and devotion of the funds to " objects essentially different" from those originally contemplated. At *p. 182* Chancellor Zabriskie says of the extension in that case : " The extension authorized by the act of 1861 is a radical change in the object of this corporation ; it is an enterprise entirely different from that in the charter." And at *p. 183:* " It is settled that the objects and business of the partnership or corporation cannot be changed or abandoned," &c. And Mr. Beach, in his treatise on " Private Corporations," section 41, speaking of amendments to charters which should bind the stockholders, says :

" If the amendment be for the benefit of the corporation, or merely *auxiliary to the original purposes* for which the company was organized, the consent of a majority of the members is sufficient to render it effective and binding upon all the incorporators,"

citing a large number of authorities for that position. " But," he continues, " if the amendment be fundamental, radical and vital, the unanimous acceptance of all the incorporators is requisite to render it binding," &c. And in section 42, distinguishing between changes that are material and those that are immaterial, he says :

" Whether an amendment be material or immaterial depends largely upon the circumstances of each particular case. Under certain circumstances, amendments authorizing railway companies to build branch lines have been held to be merely auxiliary to the original purpose of incorporation, and acceptance thereof by a majority of the stockholders was deemed sufficient."

Applying these rules to this case, I am of the opinion that it is distinguishable from *Stickle* v. *Liberty Cycle Co.*, and that the carrying on of the reducing works at Bethlehem is not a breach of the original contract.

But I am further of the opinion that if the carrying on of the business out of the state is, under the circumstances, a breach of the terms of the contract as contained in the original certificate of organization, then it is within the reach of the clause in the thirty-third section, authorizing a change in the nature of the business by the assent of two-thirds of the stockholders. I think that it would be too narrow a construction of the language just referred to, to confine it within its literal terms, as contended for by the complainants, and it would be strange indeed if the legislature must be understood to have authorized a change in so important a matter as the *nature* of the business and omit to provide for a change of its mere location. The law administered in this state with regard to the inviolability of contracts was well settled many years before the passage of the act of 1875. The leading case of *Kean* v. *Johnson* was decided in 1853. That was followed by *Zabriskie* v. *Hackensack and New York Railroad Co.*, in 1867, and again by *Black* v. *Delaware and Raritan Canal Co.*, in 1873. And it is fairly inferable that the thirty-third section was intended to prevent a few dissentient stockholders, as here, from setting up their wills against the will of a large majority, and the statute should be so construed as to further that object.

The case is one which does not appeal to a court of equity. The ownership and operation of the Bethlehem plant is of great value and importance to the corporation. It would be a positive pecuniary injury to the company to deprive it of the use of those works.

So far I have considered the case as if the New Jersey Zinc Company was directly operating these extra-territorial works by its hired agents, and have treated the machinery of the maintenance of extra-territorial corporate organizations as a mere shell, and have not considered a powerful argument addressed to me by the defendants to the effect that the authority to purchase

Meredith *v.* New Jersey Zinc and Iron Co.

stock in other corporations was undoubtedly a change in the nature of its business, which is within the language of the thirty-third section of the act, and hence beyond the criticism of the counsel of complainants in that behalf, and that the ownership of the stock carried with it the right to exercise the ordinary rights of a stockholder in electing the officers of a corporation, and through them determining its policy. A part of the argument is that while the ownership of the stock in other corporations was not perhaps within its power in 1880, when the corporation was organized, it has been authorized by subsequent legislation in existence at the time the contract of January, 1897, was made, and that the fair purview of the thirty-third section of the act is to enable the company to change its purposes by taking on any business which is within the powers delegated by the legislature to such a corporation at the time the right is exercised. Without deciding that question, I am of the opinion, for the reasons already stated, that the amended certificate became effective to change the objects of the corporation under the thirty-third section of the act of 1875, and that it justified the ownership and the carrying on of all the extra-territorial work, and that it is immaterial whether a mere change of location is strictly within that section or not; and that the bill must be dismissed, with costs.

I will add that the amount involved in the controversy, the importance of the questions presented, and the earnestness of the counsel for complainants, have induced me to give my reasons at greater length than any difficulty in the solution of those questions would warrant.